OPINION
{¶ 1} Defendant-appellant, Michael Hogan, appeals from Mahoning County Common Pleas Court judgments convicting him of murder and aggravated robbery following a jury trial, sentencing him for those offenses, and denying his motion for a new trial.
 {¶ 2} On May 31, 2002, John and Louise Ruble went to the recycling station at Fire Station Number 4 on South Avenue in Boardman. When they exited their car to unload their recyclables, Mrs. Ruble left her purse on the front seat. When Mrs. Ruble turned to get back into their car, she saw her husband hanging on to a moving blue car. The car was headed toward South Avenue at a high rate of speed while dragging Mr. Ruble. As the car neared South Avenue, Mr. Ruble fell onto the pavement. The car backed up, struck a mailbox, and ran over Mr. Ruble. The car then went forward and ran Mr. Ruble over a second time. It then drove away. Mr. Ruble died shortly after from his injuries. A witness identified appellant as the driver of the car that struck and killed Mr. Ruble.
 {¶ 3} A Mahoning County grand jury subsequently indicted appellant on one count of murder, a first degree felony in violation of R.C. 2903.02(B), and one count of aggravated robbery, a first degree felony in violation of R.C. 2911.01(A)(3). Appellant proceeded to a jury trial and the jury found him guilty as charged. Subsequently, the trial court sentenced appellant to 15 years to life for murder and 10 years for aggravated robbery, to be served consecutively.
 {¶ 4} Appellant subsequently filed a motion for a new trial, asserting various errors. Next, he filed a timely notice of appeal from his judgment entry of sentence. The trial court denied appellant's motion for a new trial. He then filed a timely notice of appeal from that judgment. This court consolidated the two appeals.
 {¶ 5} Appellant raises three assignments of error, the first of which states:
 {¶ 6} "THE TRIAL COURT DENIED MICHAEL HOGAN DUE PROCESS OF LAW AND THE RIGHT TO A JURY TRIAL, IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, BY SENTENCING MR. HOGAN TO PRISON BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY MR. HOGAN."
 {¶ 7} Appellant argues that his sentence to maximum, consecutive sentences is unconstitutional based on the United States Supreme Court's decision in Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403. He contends that since the jury did not make any findings regarding the facts required to sentence him to maximum, consecutive sentences, the trial court had no choice but to sentence him to the minimum sentences to run concurrently. Specifically, he points to the court's findings that (1) he had a considerable criminal history, (2) he was on parole at the time he committed the offense, (3) he was recently indicted for possession of crack cocaine and was out on bond, and (4) he was likely to recidivate. Appellant contends that, underBlakely, the jury was required to make these findings.
 {¶ 8} We must first note that appellant did not raise this issue in the trial court. This court recently addressed the issue of whether a defendant has to raise a Blakely issue in the trial court in order to preserve it for review on appeal in State v. Barnette, 7th Dist. No. 02-CA-65, 2004-Ohio-7211. Barnette failed to raise a Blakely challenge in the trial court. This court determined that Barnette had waived aBlakely challenge because he did not object in the trial court to what he contended was a violation of his constitutional right to a jury trial. Id. at ¶ 102. We also noted that the fact that the Supreme Court did not decide Blakely until after Barnette had submitted his brief on appeal, and after oral argument had been held, was not determinative in our analysis. Id. at ¶ 103. This was because the Supreme Court, and other federal and state courts, had reviewed the issues in Blakely many times previously. Id. This court observed that Blakely was only the most recent in a line of cases that includes Apprendi v. New Jersey (2000),530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. Id. In Apprendi, the Supreme Court held that, "`it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" Barnette, 7th Dist. No. 02-CA-65, at ¶ 104, quotingApprendi, 530 U.S. at 490.
 {¶ 9} We noted that Apprendi was decided well before Barnette was convicted and sentenced. Id. at ¶ 105. And because Blakely dealt with "well-established, rather than novel, constitutional rights," Barnette was required to have timely raised them at trial in order to preserve the issue on appeal. Id.
 {¶ 10} Like Barnette, appellant failed to raise the issue of his right to a jury trial regarding sentencing in the trial court. Thus, based onBarnette, he has waived this issue on appeal.
 {¶ 11} However, even if appellant had timely raised the issue in the trial court, this court also determined in Barnette that Ohio's felony sentencing scheme does not violate the holdings in Apprendi and Blakely.
Id. at ¶ 106. We observed:
 {¶ 12} "In Ohio, the trial judge does not have the discretion to impose a sentence greater than the sentence prescribed for each crime as listed in the indictment. * * * Unlike the statutes at issue in Blakely,
Ohio's statutory scheme does not provide exceptions to give the trial court power to exceed the maximum punishment allowed by the * * * [applicable] statute. Any sentencing enhancements, such as gun specifications, must also be included in the indictment, and the jury must find the defendant guilty beyond a reasonable doubt of those enhancements as well." Id.
 {¶ 13} Finally, we acknowledged our agreement with other Ohio appellate districts that have concluded that the Ohio felony sentencing scheme does not violate the holdings in Apprendi and Blakely. Id. at ¶ 107, citing State v. Scheer, 4th Dist. No. 03CA21, 2004-Ohio-4792; Statev. Sour, 2d Dist. No. 11913, 2004-Ohio-4048; State v. Bell, 1st Dist. No. C030726, 2004-Ohio-3621.
 {¶ 14} Therefore, even if appellant had timely raised this issue in the trial court, the result would be the same. Accordingly, appellant's first assignment of error is without merit.
 {¶ 15} Appellant's second assignment of error states:
 {¶ 16} "IN VIOLATION OF DUE PROCESS, THE GUILTY VERDICTS ON THE AGGRAVATED ROBBERY AND MURDER WERE ENTERED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 17} Appellant contends that the jury's verdict was against the manifest weight of the evidence.
 {¶ 18} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390, 678 N.E.2d 541.
 {¶ 19} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 20} The jury convicted appellant of murder in violation of R.C. 2903.02(B) and of aggravated robbery in violation of R.C. 2911.01(A)(3).
 {¶ 21} R.C. 2903.02(B) provides:
 {¶ 22} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 23} R.C. 2911.01(A)(3) provides:
 {¶ 24} "No person, in attempting or committing a theft offense, * * *, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 25} "* * *
 {¶ 26} "Inflict, or attempt to inflict, serious physical harm on another."
 {¶ 27} We must examine the relevant evidence presented at trial to determine if appellant's argument has merit.
 {¶ 28} Mrs. Ruble testified first. She stated that she and her husband had gone to the recycle station behind the Boardman fire station on South Avenue during the afternoon of May 31, 2002. They exited the car and unloaded the recyclables. (Tr. 350). Mrs. Ruble left her purse in the car on the front seat. (Tr. 350, 353). The trunk was open and Mrs. Ruble did not have a clear view around it. (Tr. 355). After she put the last items into the recycle bin, Mrs. Ruble turned around to see her husband hanging onto a blue car as it drove at a high rate of speed down the driveway towards South Avenue. (Tr. 356-57). She stated that the car backed up and her husband fell onto the pavement. (Tr. 358). The driver of the car then backed it up, running over her husband. (Tr. 358). The driver then drove forward, running over Mr. Ruble again and this time dragging him. (Tr. 359-60). Mr. Ruble died as a result. (Tr. 368-69).
 {¶ 29} Mrs. Ruble also identified a purse that was found in Mill Creek Park as her purse that was taken that day. (Tr. 351-52). She testified that after leaving the recycle station, she cancelled her Discover Card. (Tr. 368).
 {¶ 30} Mill Creek Park Officer Wilbert Drayton located Mrs. Ruble's purse. He testified that someone who was walking in the park found Mrs. Ruble's purse and turned it in to him. (Tr. 890). Detective Sergeant Stephen Riwniak testified that cash was stolen from Mrs. Ruble's purse. (Tr. 1121).
 {¶ 31} Patricia Sikora works at a lottery booth in the Matthews Plaza near the fire station. She was working on the day in question. Sikora remembered that a white man in a blue car with peeling paint drove through her booth to buy cigarettes. (Tr. 388-89). When she was shown a photograph of appellant's car, Sikora testified that although she was not absolutely certain that it was the same car she saw that day, it was consistent with the one she saw. (Tr. 391).
 {¶ 32} Joseph Pink was driving east on 224 around one o'clock in the afternoon on May 31. He testified that he was behind a faded, dark blue Cadillac with the windows down playing loud, vulgar rap music. (Tr. 404). When he approached the intersection at South Avenue, the Cadillac pulled into the left-hand turning lane to go onto South Avenue and he pulled up next to it. (Tr. 404). He sat next to the Cadillac for a good minute, as the light had just changed. (Tr. 404-405). Pink tried to get the Cadillac driver's attention to make a comment to him about his music, but the driver did not look over at him. (Tr. 405-406). Pink described the driver as a clean, white male wearing a light tee shirt. (Tr. 406). He also stated the driver had light brown hair slicked back and had a pointed nose. (Tr. 406). Pink later picked appellant out of a photo lineup as the driver of the Cadillac. (Tr. 443). He also identified appellant in court as the driver of the Cadillac he saw that day. (Tr. 443).
 {¶ 33} Detective Riwniak also testified about Pink's identification of appellant. He stated that when he showed Pink a photo lineup, Pink picked out appellant with a front view and again with a profile view. (Tr. 1005).
 {¶ 34} Appellant's counsel questioned Pink about the statement he gave to police. In his statement, Pink stated that the driver of the Cadillac had a ponytail. (Tr. 451). Pink admitted that appellant did not have a ponytail in the photo lineup. (Tr. 452).
 {¶ 35} Bernie Belfrange was driving on South Avenue in the early afternoon of May 31. When he was in front of Pat Catan's, Belfrange noticed a blue car backing out of the recycle station at a fast rate of speed. (Tr. 456). He stated that he saw a man being dragged by the car. (Tr. 456). When the car got in front of the fire station, it whipped around and ran over the man's legs. (Tr. 457). Belfrange then saw the car back into a mailbox, run over the man again, and drag the man under the car. (Tr. 457). The car finally drove past Belfrange at a high rate of speed. (Tr. 457). Belfrange stated that the car was a late 80's Cadillac. (Tr. 457). He also stated that he got a good profile view of the driver. (Tr. 457).
 {¶ 36} Belfrange stated that the police brought him a photo lineup to see if he could identify the driver of the Cadillac. (Tr. 461). However, the photo lineup only contained front views, not profiles. (Tr. 461). Belfrange could not make a definite identification from the front view photos and asked for profile photos. (Tr. 462). The police showed him profile photos a few days later. (Tr. 463). Belfrange picked out appellant's photo as the man he saw driving the Cadillac. (Tr. 463; State's Exh. 154). Belfrange then identified appellant in court as the man he saw run over Mr. Ruble. (Tr. 463-64).
 {¶ 37} Detective Riwniak was present when Belfrange examined the photo lineup. He stated that Belfrange originally picked appellant out of the front view photos, but stated that he needed a side profile to be sure. (Tr. 1001). Detective Riwniak testified that a few days later, he showed Belfrange a photo lineup with side profiles and Belfrange immediately identified appellant. (Tr. 1001).
 {¶ 38} On cross-examination, Belfrange acknowledged that in his statement to police, he described the man he saw as being no more than 22 years old, with very short, dark hair. (Tr. 467). He also noted that the man was wearing a white tee shirt and had a pointy nose. (Tr. 467). Belfrange additionally stated that the Cadillac was a two-door vehicle. (Tr. 477).
 {¶ 39} Boardman Police Officer Mark Jacobs testified that he was the first officer dispatched to the scene at approximately 1:30 p.m. (Tr. 482). At that time, the ambulance had arrived and paramedics were tending to Mr. Ruble. (Tr. 483). While at the scene, Officer Jacobs measured the width of the tire acceleration marks. (Tr. 528). He found that from outside edge to outside edge measured 63 inches. (Tr. 529).
 {¶ 40} Officer Jacobs also testified that he was called to 135 East Myrtle in Youngstown the day after Mr. Ruble died. (Tr. 503). There he found a Cadillac matching the description of the car that ran over Mr. Ruble. He and other officers put a tarp around the car and had it towed. (Tr. 506). Officer Jacobs opined that the marks on the bumper of the Cadillac were consistent with the mailbox post in front of the fire station where Mr. Ruble was struck. (Tr. 513-14). He also opined that the side of the Cadillac was consistent with having rubbed against the flag pole at the fire station. (Tr. 514).
 {¶ 41} Becky Fiore is appellant's neighbor. She testified that in the early evening of May 31, she noticed a dark blue Cadillac pull into the Hogans' driveway. (Tr. 621). Appellant was driving the car. (Tr. 621). Appellant got out of the car, went into the garage, moved something out of the way, pulled the car into the garage, and closed the garage door. (Tr. 621). Fiore also testified that the Cadillac had previously always parked in the driveway. (Tr. 624). She had never seen it parked in the garage before that day. (Tr. 624).
 {¶ 42} Brian Sloan is a DNA analyst at Orchid Cellmark who analyzed DNA evidence in this case. Hairs were found stuck to appellant's Cadillac. Sloan analyzed one of those hairs and compared it to Mr. Ruble's blood sample. Although he was unable to test the hair's nuclear DNA, Sloan was able to analyze the hair's mitochondrial DNA. Mitochondrial DNA is passed down through maternal lineage. (Tr. 640). It is used to analyze DNA when traditional nuclear DNA sequencing has failed. (Tr. 639). Based on his analysis, Sloan was able to determine, within a reasonable degree of scientific certainty, that the hair found attached to appellant's car came from someone of the same maternal lineage as Mr. Ruble. (Tr. 670).
 {¶ 43} Officer John Gares arrested appellant during the evening of May 31, on an unrelated charge, at Teenie's Tavern in Youngstown. When he arrived at the scene, appellant was standing outside of his dark blue Cadillac. (Tr. 809). Appellant's girlfriend was with him. (Tr. 809-810). When Officer Gares placed appellant in custody, appellant asked if he could release his car to his girlfriend. (Tr. 810). Officer Gares agreed. (Tr. 810). Appellant then leaned out of the window of the police cruiser and instructed his girlfriend to take his car to his father's house. (Tr. 811). He was very direct and repeated to her several times to take care of the car and not to let anyone else have the car. (Tr. 811-12).
 {¶ 44} Donna Rose works in the trace evidence unit at the Bureau of Criminal Identification and Investigation (BCI). She examined the jean shorts Mr. Ruble was wearing when he was run over. Rose testified that the jean shorts were missing a belt loop. (Tr. 863). She also examined a belt loop that was found attached to the underside of appellant's Cadillac. She stated that she compared the color of the material on the jeans and belt loop and examined them microscopically. (Tr. 864). She looked at the threads to inspect the type of fabric, the consistency of the color, and the diameter of the threads. (Tr. 865). She opined that the threads from Mr. Ruble's jean shorts and the belt loop found under appellant's car were similar with respect to color, microscopic characteristics, and chemical composition. (Tr. 867).
 {¶ 45} Detective Riwniak also testified about the belt loop. He stated that there was a piece of fabric under the car close to the catalytic converter. (Tr. 1020). The piece of fabric was later determined to be the belt loop. (Tr. 1020).
 {¶ 46} Detective Riwniak additionally testified regarding his inspection of the car. He testified that when he visually inspected appellant's car, he noticed that there was a dent to the gas tank and that the undercarriage looked like something had brushed up against it on the driver's side. (Tr. 986). He also stated that he could see fibers or hairs near the driver's side rear wheel well and on the corner of the rear bumper. (Tr. 986-87). Additionally, he saw a cloth fabric on the front bumper. (Tr. 986).
 {¶ 47} Furthermore, upon inspecting the inside of the car, Detective Riwniak found cleaning supplies in the back seat. (Tr. 1021). He further observed that the car looked like it had recently been washed. (Tr. 1021).
 {¶ 48} On cross-examination, appellant's counsel questioned Detective Riwniak about another suspect police had in this case. Boardman police had received information regarding a man named Joe Direnzo, who was involved with several purse snatchings, one occurring on May 30, 2002. (Tr. 1087). Direnzo was also a suspect in this case. (Tr. 1092). Additionally, one Hector Pagan described Direnzo as having shoulder-length blonde hair, a thin beard, and wearing a white tee shirt on May 31, 2002. (Tr. 1107). Counsel mentioned that while appellant's hair was not long enough for a pony tail, Direnzo's hair was. (Tr. 1108). This was relevant because Pink had described the man he saw on 224 turning onto South Avenue as having a pony tail. (Tr. 451, 1108). Furthermore, Detective Riwniak attempted to corroborate Direnzo's statement that he was at a doctor's appointment on the day on question, only to find out Direnzo did not have an appointment that day. (Tr. 1110-11). Additionally, Detective Riwniak testified that Direnzo gave police a statement implicating appellant. (Tr. 1080-83). Finally, Detective Riwniak noted that one Sarah Cassidy gave a statement that she saw the driver of the car come out of the Pat Catan's parking lot at a high rate of speed and that he was a black man. (Tr. 1115-16). This was relevant because Pagan told police Direnzo was with a black man that day. (Tr. 1116).
 {¶ 49} Ed Lulla works for BCI investigating crimes in Northeast Ohio. He inspected appellant's Cadillac. Lulla testified that he noticed several hairs hanging from the car. (Tr. 1132-35, 1147). He also found the belt loop hanging from the undercarriage. (Tr. 1142).
 {¶ 50} Additionally, appellant called numerous witnesses in his defense.
 {¶ 51} Steven Grim testified that on the afternoon in question, he took appellant's mother to an appointment and then to Teenie's Tavern. (Tr. 1223). At 12:16 p.m., he received a call on his cell phone from appellant, who was at home at the time. (Tr. 1223-24, 1227). At 12:45 p.m., Grim dropped appellant's mother off at home and saw appellant in the garage cleaning his car. (Tr. 1228-29).
 {¶ 52} Hector Pagan testified that police questioned him about Direnzo's whereabouts. (Tr. 1236). Direnzo had stayed at Pagan's house previously. (Tr. 1236). Pagan testified that on the day in question, Direnzo came to his house and asked him to cash a stolen check for him. (Tr. 1241). Direnzo was with his girlfriend and a black man in a blue-gray, four-door Cadillac. (Tr. 1241). Pagan testified that he told Direnzo and his girlfriend that police had questioned him about them regarding a homicide and that they were scared. (Tr. 1246).
 {¶ 53} On cross-examination Pagan testified that appellant and Direnzo knew each other. (Tr. 1247). He also testified that Direnzo's brother informed him that Direnzo had robbed someone at a cemetery. (Tr. 1248-49).
 {¶ 54} Officer Anthony Ciccotelli testified regarding damage to appellant's car in December 2001. He stated that he had appellant's Cadillac towed on December 30, 2001. (Tr. 1261). At that time, the car had a dent in the right, rear bumper and the left, front bumper had a dent and small scratches on it. (Tr. 1262).
 {¶ 55} Neal Zoldan, a private investigator, examined appellant's car in September and October 2002. Zoldan testified that he measured the tires on appellant's car from outside wall to outside wall and found that from tread mark to tread mark measured 66 inches. (Tr. 1281). This conflicted with Officer Jacobs' measurement of the tire marks at the scene, which he measured to be 63 inches. (Tr. 530). However, Dale Chambers testified that a car's wheel base can change based on variables such as weight shifting and air loss. (Tr. 795-98).
 {¶ 56} William Hummel towed appellant's Cadillac on April 29, 2002 because it had a flat tire. He testified that at that time, the Cadillac had a dent in the left door. (Tr. 1289). However, he also testified that at that time the Cadillac did not have any damage to the undercarriage. (Tr. 1297).
 {¶ 57} Sarah Cassidy was traveling on South Avenue on the day in question. She noticed a car fly out of the Pat Catan's parking lot between 1:02 and 1:30 p.m. (Tr. 1302, 1311). She testified that it was a square car, black or dark blue, and probably a late 80's model. (Tr. 1302, 1310). Cassidy stated that a black man was driving the car. (Tr. 1303).
 {¶ 58} Patricia Billet was also traveling on South Avenue that day. As she approached the fire station, she heard somebody cry out, saw a car back into the mailbox, and then the car ran over a man lying on the ground in the fire station's driveway. (Tr. 1315-16). She described the car as a charcoal gray, either an Oldsmobile, Buick, or Cadillac, four-door, late 80's or early 90's model. (Tr. 1316, 1319-20). Billet testified that she recognized the car as an Oldsmobile or Buick because the taillights were flush to the car. (Tr. 1318). When she was shown photographs of appellant's car, Billet testified that the body looked like the car she saw that day but that the taillights were different. (Tr. 1321-22).
 {¶ 59} Sandra Campana, like the others, was traveling on South Avenue that day. She saw a car at the fire station run over an elderly man. (Tr. 1336-37). She noticed that the car was dark blue and that it had a dent by the front tire. (Tr. 1337). When counsel showed Campana photographs of appellant's car, she stated that it was not the car she saw that day because it did not have the dent that she noticed. (Tr. 1342).
 {¶ 60} Jeff D'Altorio was also driving on South Avenue that day. He observed a Cadillac leave the fire station and pull directly in front of him. (Tr. 1357). D'Altorio described the Cadillac as being four-door and faded blue. (Tr. 1358). He described the driver as an 18 to 30 year-old with short, tight hair that was spiked up. (Tr. 1360). D'Altorio testified that police showed him a photo lineup, but he could not pick out the man he saw. (Tr. 1361). When counsel showed him a photograph of appellant's car, D'Altorio stated that he did not think that was the Cadillac he saw because he remembered it being a lighter blue. (Tr. 1363).
 {¶ 61} Appellant makes several assertions in support of his argument that the verdict was against the manifest weight of the evidence.
 {¶ 62} First, he claims the evidence demonstrated that he was not near the fire station or recycle center on South Avenue on the day in question. While Grim testified that he saw appellant at his home at 12:45 p.m., no witness testified that they saw appellant shortly after that time at home. Furthermore, witnesses testified that Mr. Ruble was run over after 1:00 p.m., probably around 1:30 p.m. Appellant lived on Forrest Ridge Drive, which is not far from the crime scene. Therefore, even if the jury chose to believe Grim's testimony, they could have reasonably concluded that appellant had plenty of time to drive from his home to the fire station. Furthermore, Pink identified appellant as being the man he saw at the intersection of 224 and South Avenue just before 1:00 p.m. Thus, the jury may have found Grim's testimony unbelievable.
 {¶ 63} Second, appellant contends his appearance does not match the description of the driver that struck Mr. Ruble. Several witnesses described drivers they saw near the scene at the time Mr. Ruble was struck. Other witnesses testified that they saw the car that ran over Mr. Ruble. But only Belfrange testified that he actually saw the car running over Mr. Ruble and the man that was driving it. Belfrange testified that he got a good profile view of the driver. He picked appellant's photograph from two lineups, both a front view and a profile. He also identified appellant in court. Thus, the only witness who actually saw the driver of the Cadillac as it ran Mr. Ruble over was able to identify him in two photo lineups and in court.
 {¶ 64} Third, appellant asserts that his Cadillac does not match the description of the car that struck Mr. Ruble. While some witnesses described cars leaving the crime area around the same time as the crime occurred at high rates of speed, only Belfrange, Billet, and Campana testified that they actually saw the car run over Mr. Ruble. Belfrange stated that the car was a late 80's two-door Cadillac. Appellant's Cadillac, however, has four doors. Billet described the car as a charcoal gray, either an Oldsmobile, Buick, or Cadillac, four-door, late 80's or early 90's model. This description fits appellant's car. However, Billet also testified that the taillights were flush to the car. The taillights on appellant's car are not flush to the car. Campana testified that the car was dark blue and that it had a dent by the front tire. She stated that because appellant's car did not have the dent she remembered, it was not the right car.
 {¶ 65} While this testimony tends to indicate that appellant's car may not have been the one that ran over Mr. Ruble, we must also consider the other evidence in this case. Lulla inspected appellant's Cadillac and testified that he noticed several hairs hanging from the car. He also found a belt loop hanging from the undercarriage. Analysis of one these hairs revealed that it came from Mr. Ruble or someone with his same maternal lineage, i.e. his sibling, his mother, his grandmother. The chances of someone of Mr. Ruble's same maternal lineage losing a hair and it ending up attached to the bottom of appellant's Cadillac are slim at best. Furthermore, the shorts Mr. Ruble was wearing when he was run over lost a belt loop. Analysis determined that the threads in the belt loop found attached to the bottom of appellant's Cadillac and the threads in Mr. Ruble's jean shorts were similar with respect to color, microscopic characteristics, and chemical composition. Thus, the jury could have reasonably concluded that the belt loop attached to appellant's car was ripped from Mr. Ruble's shorts and the hair attached to appellant's car came from appellant. Therefore, the jury could have logically concluded that appellant's car ran over Mr. Ruble.
 {¶ 66} Fourth, appellant contends that the State's two experts could not point to any concrete proof that his car was the one that struck Mr. Ruble. As just discussed, while neither expert could say that appellant's car was absolutely, certainly the car that ran over Mr. Ruble, their testimony indicated a high probability that appellant's car was the one that did so.
 {¶ 67} Finally, appellant argues that appellee failed to present any evidence that he stole Mrs. Ruble's purse. Mrs. Ruble stated that when she got out of her car at the recycle station, she left her purse on the front seat. After her husband was taken to the hospital, Mrs. Ruble called to cancel her Discover Card. Mrs. Ruble also identified a purse that was found in Mill Creek Park as her purse that was taken that day. Officer Drayton testified that someone who was walking in Mill Creek Park found Mrs. Ruble's purse and turned it in to him. "Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence." State v. Jenks (1991), 61 Ohio St.3d 259, 272,574 N.E.2d 492. While the State did not present any direct evidence that appellant stole Mrs. Ruble's purse, the circumstantial evidence indicated otherwise.
 {¶ 68} Given the evidence discussed above, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. Thus, appellant's second assignment of error is without merit.
 {¶ 69} Appellant's third assignment of error states:
 {¶ 70} "THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GRANTING MICHAEL HOGAN'S MOTION FOR NEW TRIAL BASED ON MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 71} Appellant argues that the trial court abused its discretion in denying his motion for a new trial because his convictions were against the manifest weight of the evidence as set out in his second assignment of error.
 {¶ 72} The decision of whether to grant a motion for new trial rests in the trial court's sound discretion and, absent an abuse of discretion, that decision will not be disturbed. State v. Hawkins
(1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227.
 {¶ 73} Pursuant to Crim. R. 33(A), a court may grant a new trial based on:
 {¶ 74} "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
 {¶ 75} "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
 {¶ 76} "(3) Accident or surprise which ordinary prudence could not have guarded against;
 {¶ 77} "(4) That the verdict is not sustained by sufficient evidence or is contrary to law. * * *;
 {¶ 78} "(5) Error of law occurring at the trial;
 {¶ 79} "(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial."
 {¶ 80} Noticeably absent from the reasons justifying a new trial is that the jury's verdict was against the manifest weight of the evidence. Furthermore, as discussed in appellant's second assignment of error, his convictions were not against the manifest weight of the evidence. Thus, the trial court did not abuse its discretion in denying appellant's motion for a new trial. Accordingly, appellant's third assignment of error is without merit.
 {¶ 81} For the reasons stated above, the trial court's judgments are hereby affirmed.
Waite, J., concurs.
DeGenaro, J., dissents. See dissenting opinion.